**GRIFFIN INDUSTRIES, INC., Appellant,**

v.

**FOODMAKER, INC., d/b/a Jack in the Box, Appellee.**

No. 14–98–00881–CV.

Court of Appeals of Texas, Houston (14th Dist.).

May 11, 2000.

Chris C. Papas, Daniel F. Crowder, Houston, for appellants.

David J. Van Susteren, William J. Boyce, Houston, for appellees.

Panel consists of Justices SEARS, CANNON, and SONDOCK.*

## OPINION

RUBY SONDOCK, Justice (Assigned).

The principal question in this appeal is whether Griffin Industries, Inc. ("Griffin") owes indemnity to Foodmaker, Inc., d/b/a Jack in the Box ("Foodmaker") for attorney fees and $12,000.00 paid by Foodmaker to one of its employees injured in the course and scope of his employment. Griffin also contends that the evidence is legally and factually insufficient to support the jury's verdict. We review the legal and factual sufficiency of the verdict using the usual standards of review. *See Merrell*

---

* Senior Justices Ross A. Sears, Bill Cannon, and Ruby Sondock sitting by assignment.

*Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997); *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 632 (Tex.1986).

On March 16, 1992 Foodmaker submitted to Griffin a Service Agreement, which did not describe services, time, price or any details of the parties' relationship, but did provide—in the same size and type as the balance of the one page document—that Griffin would:

> [I]ndemnify and hold (Foodmaker) harmless from and against (1) any and all claims, suits, liabilities, damages and judgments for injury to death of any person, including but not limited to any employee of (Griffin) or of (Foodmaker), and for loss of or damage to property, arising out of or in any manner directly or indirectly connected with said services and/or products, regardless of the negligence of (Foodmaker), its agents or employees, except where such claim, suit, liability, or damage judgement [sic] is the result of the sole negligence or willful misconduct of (Foodmaker), its agents or employees, and (2) all costs, expenses and attorneys' fees incurred in defending such claims and suits.

Only Griffin executed this agreement. Several days later both Griffin and Foodmaker signed another document entitled, "Waste Grease Removal Service Agreement." The relevant portions of the grease removal agreement material to this opinion are:

\* \* \*

Conditions of Agreement

1) Foodmaker, Inc. of Houston, Texas and Griffin Industries, Inc. hereby agree that Griffin shall be entitled to provide exclusive removal service for all spent cooking oils and shortening at each location owned and/or operated by Customer.

2) Griffin shall provide a regular pick-up schedule of such materials. Schedule will be established by Griffin in accordance with store volumes. Due to operating hours established by the Department of Transportation of the United States, customer will allow Griffin to provide removal service upon arrival at location. Provided such service does not prevent normal store operations.

3) Customer understands and agrees that all equipment provided by Griffin entrusted to Customer is and shall remain the sole property of Griffin Industries.

\* \* \*

5) Griffin will be responsible only for a mess made by a Griffin driver. Spills/messes left ... from poor dumping practices, shall not be considered the liability of Griffin.

\* \* \*

7) Customer agrees to notify Griffin, in writing of any problems with regards to this agreement in a timely manner. At which time Griffin and Customer will establish a time frame for correcting the problem.

\* \* \*

9) This agreement shall remain in effect for a period of 24 months. Foodmaker may cancel this agreement provided that thirty (30) days written notice is given to Griffin, only if Griffin does not provide adequate service or adhere to this agreement.

This document details the payment terms and other conditions of the agreement whereby Griffin would supply a vat into which Foodmaker would deposit its used grease for periodic pick-up and purchase by Griffin.

The vat supplied by Griffin was 6'10" high and had a 2'x2' covered opening at the top for ventilation. The vat was designed to be filled by Foodmaker personnel with a pump at the bottom of the vat. Griffin's general manager testified the company instructed Foodmaker on the proper operation of the pump, but did not warn against filling the vat through the ventilation opening because it never

thought that would be attempted. He also testified that he believed putting the ventilation opening 6'10" high was far enough out of the way so it would not be used for anything else, but "if someone wants to climb up, take the lid off and pour the grease in, that is something we (Griffin) can't stop them from doing . . . ."

Although Griffin supplied the large vat in which to store the grease until picked up, Foodmaker supplied the containers to carry the grease from the frying machines to the storage vat. Foodmaker also furnished its employees a written policy and procedure for "shortening safety," which required employees to use a lidded bucket, heat resistant gloves, protective goggles and aprons when handling hot grease.

On September 13, 1996, one of Foodmaker's employees, with the help of the acting manager, successfully maneuvered himself and a heavy, unlidded container of hot grease up a ladder and emptied the grease into the 2'x2' opening at the top of the vat without wearing any of the protective clothing required by Foodmaker's policy. Part of the supervisor's duty was to make sure the employee was wearing protective clothing when handling hot grease. The acting manager later told the employee to make a second trip up the ladder (which the employee had reported as greasy and wobbly) to dispose of more hot grease. On this trip, without the help of the manager who was then busy elsewhere, the employee fell and was injured. No Griffin personnel were present at Foodmaker's restaurant that day, prior to or at the time of the occurrence.

It is undisputed that the pump on the vat was not working on the day of the injury. Griffin's general manager enumerated three alternatives available to Foodmaker when the pump did not work. Foodmaker's prevention manager admitted that malfunctioning equipment that presents a danger to an employee should not be used until repaired. One of Foodmaker's employees testified that he had made two or three calls for service but no one from Griffin responded before the accident. Griffin's general manager testified that untimely response for service was not acceptable. Foodmaker had no documentation of the calls and Griffin did not retain any record of service calls after repairs were made. There is no evidence that Foodmaker ever gave written notice of any complaint about service as the Waste Grease Service Removal Agreement required. Failure to respond to the service call or calls to repair the pump is the sole basis of Foodmaker's claim of Griffin's negligence.

■ There is no evidence and certainly insufficient evidence of negligence by Griffin that could constitute a proximate cause of injury to Foodmaker's employee. Assuming, without deciding, that Griffin did not respond to one or more service requests in a timely manner, such conduct might constitute a breach of its service contract with Foodmaker but it is not evidence of negligence. The duty to pick up the grease stems solely from the parties' contract. *See Southwestern Bell Tel. Co. v. DeLanney,* 809 S.W.2d 493, 495 (Tex. 1991).

■ On the issue of indemnity, we hold that the two service agreements entered into by Griffin and Foodmaker must be construed together and neither is ambiguous. We hold that Griffin's indemnity obligation terminated on March 22, 1994. This suit was not filed until January 21, 1997. Unlike the mythical Phoenix, contracts that terminate by their express terms do not rise again. There is no evidence that Foodmaker tried to renew or revive its indemnity agreement.

■ The Supreme Court has stated that the question of whether indemnity exists is a rule of contract interpretation and should be determined by the court as a matter of law. *See Fisk Elec. Co. v. Constructors & Assoc., Inc.,* 888 S.W.2d 813, 814 (Tex.1994); *Dresser Indus., Inc. v. Page Petroleum, Inc.,* 853 S.W.2d 505, 509 (Tex.1993). Even if Foodmaker's

claim for indemnity could survive the express termination date made a condition of the parties' agreement, it would not prevail. This Court has previously recognized the obvious; "indemnity agreements transfer risk between the parties." *U.S. Rentals, Inc. v. Mundy Service Corp.*, 901 S.W.2d 789, 791 (Tex.App.—Houston [14th Dist.] 1995, writ denied). However, "because indemnifying a party for its own negligence is an extraordinary shifting of the risk, the Supreme Court has applied a fair notice requirement to indemnity agreements." *Id.* This requirement, also called the express negligence rule, requires:

1. A party's intent to be released from all liability caused by its own future negligence must be expressed in unambiguous terms within the four corners of the contract. *See Dresser*, 853 S.W.2d at 508–09; *Ethyl Corp. v. Daniel Constr. Co.*, 725 S.W.2d 705, 708 (Tex.1987). and,

2. The indemnity clause must be "conspicuous" under the objective standard defined in the Uniform Commercial Code. *See* TEX.BUS. & COM. CODE ANN. § 1.201(10) (Vernon 1994);[1] *Littlefield v. Schaefer*, 955 S.W.2d 272, 273 (Tex.1997).

The indemnity clause must meet both prongs of the express negligence rule.

■ We hold that the service agreement purporting to secure indemnity for Foodmaker for its own conduct at least fails to meet the conspicuous requirement of the express negligence rules and the trial court erred in permitting the jury to determine the issue of indemnity. *See* TEX.BUS. & COM.CODE ANN. § 1.201(10) (Vernon 1994); *Dresser Indus., Inc.*, 853 S.W.2d at 509. Further, we find that the evidence does not support the jury's negligence

finding. Accordingly, we reverse the judgment entered by the trial court and render judgment that Foodmaker take nothing.

---

1. Section 1.201(10) provides:
   A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: Non–Negotiable Bill of Lading) is conspicuous.

Language in the body of a form is "conspicuous" if it is in larger or other contrasting type or color.
*See* TEX.BUS. & COM.CODE ANN § 1.201(10) (Vernon 1994).