SUPER STARR INTERNATIONAL, LLC, Lance Peterson, and Red Starr, SPR de R.L. de C.V., Appellants,

v.

FRESH TEX PRODUCE, LLC, Individually and Derivatively on Behalf of Tex Starr Distributing, LLC, Appellee.

NUMBER 13-16-00663-CV

Court of Appeals of Texas, Corpus Christi-Edinburg.

Delivered and filed July 20, 2017

Joseph J. Vale Jr., Atlas, Hall & Rodriguez, LLP, McAllen, TX, for Appellants.

Ricardo Pumarejo Jr., Kittleman, Thomas, PLLC, McAllen, TX, for Appellee.

Before Justices Rodriguez, Benavides, and Hinojosa

## OPINION

Opinion by Justice Rodriguez

The trial court granted appellee Fresh Tex Produce, LLC, Individually and Derivatively on behalf of Tex Starr Distributing, LLC, a temporary injunction order against appellants Super Starr International, LLC, Lance Peterson, and Red Starr, SPR de R.L. de C.V., that mandates and prohibits certain commercial conduct and requires the preservation of electronic information.

In seven issues, which we construe as three, appellants complain that the trial court abused its discretion by signing the temporary injunction order on the grounds that (1) there is legally insufficient evi- dence of a probable right to relief on some of the claims used as a basis to gain injunctive relief or contractual provisions negate any right to injunctive relief, (2) the parameters of the order prohibiting certain commercial conduct are overbroad and unspecific, and (3) there is legally insufficient evidence to support an injunctive restriction relating to preservation of electronic information.

We sustain in part and overrule in part the first issue on the grounds that there is legally insufficient evidence of a probable right to relief on all but one of the claims that have been asserted, and the trial court abused its discretion by mandating certain commercial conduct. Furthermore, we sustain the second and third issues. Therefore, we reverse the temporary injunction order, render a denial in part, and remand in part.

## I. BACKGROUND

The plaintiff in the underlying suit is Fresh Tex Produce, LLC (the Distributor), a Texas entity that distributes produce throughout the United States, who filed suit "individually and derivatively on behalf of" Tex Starr Distributing, LLC (the LLC).[1] The defendants are: (1) Super Starr International, LLC (the Importer), a Texas entity that imports foreign grown produce into the United States; (2) Lance Peterson, the current president of the Importer; (3) Red Starr, SPR de R.L. de C.V. (the Grower), a Mexican entity that grows produce in Mexico and exports it into the United States through the Importer; and (4) Kemal Mert Gumus,[2] an employee of the Importer.

---

1. Appellants do not contest the Distributor's capacity to sue "derivatively on behalf of" the LLC. See TEX. R. APP. P. 47.1. We assume, without deciding, that it makes no difference to our disposition. See id.

2. Gumus did not answer the Distributor's suit before the temporary injunction order was signed, and he is not a party to this interlocutory appeal.

Our understanding of the relationship of the parties, the formation of the LLC and its operation, and the dispute comes from the record of a temporary injunction evidentiary hearing at which Kenneth Alford, president of the Distributor, Lance Peterson, and George Garcia, an assistant manager in the Distributor's shipping department, testified.

## A. Pre-LLC Relationship

In 2010, the Grower, the Importer, and the Distributor, had a distribution agreement for papayas. Under the distribution agreement, the Distributor received a ten percent commission on sales proceeds. Alford testified that he was approached by David Peterson,[3] the then-president of the Importer. According to Alford, David was "happy with the sales," and he "offered us a proposed partnership." The Grower wanted to grow and sell, through the Importer, a "hybrid papaya" that was smaller, longer lasting, and more aromatic than existing papayas. The Importer proposed that the Distributor forgo its customary ten percent commission in exchange for a five percent commission, but double the volume.

## B. The LLC

### 1. LLC's Organization, Structure, and History

In December 2010, Alford, on behalf of the Distributor, and Lance and David, on behalf of the Importer, executed an operating agreement that created the LLC, a limited liability company that is governed by the Texas Business Organizations Code. See TEX. BUS. ORGS. CODE ANN. § 101.001(3) (West, Westlaw through Ch. 49, 2017 R.S.).

Under the LLC's operating agreement and minutes from an organizational meeting: the Distributor and the Importer were the LLC's only members and owners of equal halves of the LLC, Alford and David were the only managers, and Alford was the president. The operating agreement included an exclusivity provision. The exclusivity provision mandated that the LLC serve as the "sole and exclusive distributor of papayas exported into the United States by [the Importer] and/or other existing or future companies of Lance Peterson and/or David Peterson pertaining in whole or in part to the growing, production, shipping or packaging of papayas." Under the operating agreement, the exclusivity provision lasted for three years, until the end of 2013.

The business strategy for the LLC was, according to Alford, to cultivate a "high end" customer base that would pay between twenty and forty percent more per pound than ordinary papayas. Alford testified that in order to generate sales, the Distributor promoted the hybrid papaya to its existing customer base and attended multiple trade shows on behalf of the LLC. According to Alford, the LLC hired a marketing firm, which developed the hybrid papaya's new brand name—"Royal Star"—and its distinctive logos and smaller, more appealing packaging. Lance testified that the initial marketing program was split three ways between the "seed company," the LLC, and the Importer. Through marketing efforts, the LLC, according to Alford, carved out a luxury niche for Royal Star as a sweeter papaya with a longer shelf-life and a higher selling price than an average papaya.

Alford testified that the LLC's revenue came primarily from commissions on hybrid papaya sales. The Distributor's facility housed and its employees staffed the LLC's papaya distribution operation. Al-

---

**3.** David Peterson is Lance Peterson's father. We will refer to the Petersons by their first names.

ford testified that, the Distributor provided the LLC with salespeople who were familiar with the preferences and buying habits of the Distributor's customers, which were mainly grocers. The Distributor also allowed the LLC to use thirty to forty warehouse employees to grade, sort, and age the papayas.

By all accounts, the LLC was profitable. According to Alford, "net worth income" began at $264,000, and it grew to $1.3 million between 2011 to 2012, $700,000 in 2013, $1.2 million in 2014, and $1.1 million in 2015. Lance testified that, during the five-year period, total sales were "somewhere around 77 million," and the LLC was compensated in the range of $7.7 million.

In September 2013, David died. Thereafter, Lance replaced David as president of the Importer. There is no evidence that Lance was elected as a successor manager to replace David in accordance with the terms of the operating agreement.

In January 2014, a nearly identical operating agreement (the revised operating agreement) took effect. The exclusivity provision in the revised operating agreement was for a period of two years, until the end of 2015.

### 2. Gumus

Gumus, an employee of the Importer, began working at the papaya operation facility after David's death. Alford testified that he believed Gumus was responsible for quality assurance and that he needed access to only the warehouse and loading areas. However, Alford and Garcia testified that as time progressed, Gumus's presence in the LLC's sales office, a room which was locked with a code known only to managers, increased. Alford saw Gumus was taking photographs of: (1) the Distributor's "sales board," which "had every customer that we were selling our limes, our mangoes, our broccoli to;" and (2) "jackets," which are large envelopes that hold "bill of ladings, invoices, truck information and so forth."

Garcia testified that roughly a month before Gumus's eventual departure from the facility, he twice saw Gumus alone in the sales office after business hours. According to Garcia, after he reported Gumus's presence to a manager, the code to the sales office was changed. Gumus was also observed multiple times in the facility's shipping office taking photographs of documents with data on customers, pricing, and quantities.

### 3. Pina

Jose Pina was an employee of the Distributor who resigned early in the spring of 2016. Alford testified that Pina took information from the Distributor and the LLC. Specifically, Alford testified that Pina "made [unauthorized] computer copies of internal information from the shipping from truck brokers to venders to other contacts." Garcia testified that after Pina's resignation, he observed Pina at the papaya facility on a Saturday morning copying phone numbers from a Rolodex. Garcia testified that Pina went to work for the Importer approximately two weeks later.

### C. Expiration of Exclusivity Provision and Beginning of the Breakup

At the end of December 2015, the exclusivity provision under the revised operating agreement expired. The parties did not renegotiate renewal of the exclusivity provision in the revised operating agreement. Alford testified that he and Lance attempted to negotiate a new term of exclusive distributorship, but the two sides were unable to reach an agreement.

From January 2016 through March 2016, the Distributor and the Importer continued working together under the same terms as the revised operating agreement.

In March 2016, Lance told Alford that beginning in July 2016, the Importer would no longer supply the LLC with the newly developed papayas. Instead, the Importer would distribute and market the hybrid papayas to customers in the United States on its own.

In July 2016, an employee of the Importer sent a promotional email to customers who had purchased hybrid papayas from the LLC stating,

> For the past 6 years, [the Importer] has been growing the Royal Star Papaya. As of today, [the Importer] has started its own sales team to handle the Royal Star Papaya as well as other products we will be bringing out of Mexico. [The Importer] brings over 20 years of farming experience out of Mexico to the produce industry.

According to Alford, the email incorporated a sales brochure for papayas and other produce. Alford claimed that the Importer's brochure mimicked the Distributor's long-time sales brochure. Alford also took issue with the Importer's phone number announced in the email, which had the same area code and last four digits as the number for the Distributor's sales department: 956-[ ]-8014.

**D. The Suit**

In October 2016, the Distributor filed an original petition and application for injunctive relief. The Distributor asserted the following claims against the corresponding defendants:

| | | The Importer | Lance Peterson | The Grower | Kemal Mert Gumus |
|---|---|---|---|---|---|
| 1 | Breach of Partnership Agreement | x | | | |
| 2 | Breach of Joint Enterprise | x | | | |
| 3 | Breach of Joint Venture Agreement | x | | | |
| 4 | Breach of Fiduciary Duty | x | x | | |
| 5 | Texas Uniform Trade Secrets Act | x | x | | x |
| 6 | Texas Theft Liability Act | x | x | | x |
| 7 | Tortious Interference with Contract | x | x | | |
| 8 | Aiding and Abetting in the Breach of Fiduciary Duty | | | x | x |

The Distributor then sought and the trial court signed, a temporary restraining order. The trial court set the matter for a temporary injunction hearing.

**E. Evidentiary Hearing and Temporary Injunction Order**

In November 2016, the trial court held an evidentiary hearing, at which the testimony summarized above was presented. Alford argued that the LLC's customer lists contained trade secrets. In responding to the Distributor's questions on direct examination, Alford testified,

Q. Obviously, buyers of produce isn't something secret. I know that H.E.B. buys limes. So, I mean, I'm not stealing that from you, am I? How would you explain that to the Court?

A. Well, those are—certainly—those aren't unique clients. You know, H.E.B. and Kroger might think that, but what about the small guy in New Jersey or small guy in Newton, North Carolina that no one has ever heard of? You talk about the Blue Book. The Blue Book is a book of 10,000 or 12,-000 customers. Of the 12,000 custom-

ers, we have identified 50 for papayas and about 75 for other items. So to say that they are readily available, to [weed] 100 customers out of 12,000 is quite an advantage.

. . . .

Q. And as far as [the Distributor] was concerned, the proprietary confidential information that is acquired or owned, is that the customer list that it's built up over its existence, specific as to what people buy, when they buy it?

A. Exactly. These are the customers that we've whittled out. Whittled out the ones and used the ones that we deemed worthy of our business for the last ten to twelve years.

After the hearing, the trial court signed a temporary injunction order that found the Distributor "had demonstrated a probable right to relief through its claims" against the defendants. It granted injunctive relief mandating that the Importer, Lance, and the Grower (collectively appellants) continue the exclusive business relationship with the LLC (Restrictions 1 and 6 below), prohibiting conduct deemed competitive against the LLC (Restrictions 2–5 and 7 below), and mandating the preservation of electronic information (Restrictions 8 below). Specifically, the temporary injunction order restrained appellants from,

■ Distributing any [hybrid] papayas without such distribution going through [the LLC] and dividing proceeds as previously agreed;

■ Soliciting or conducting business with [the Distributor's] customers or growers;

■ Soliciting, directly or indirectly, accounts of [the LLC] or [the Distributor];

■ Diverting any business opportunity away from [the LLC] or [the Distributor];

■ Directing any business opportunity[4] away from [the LLC] or [the Distributor];

■ Refusing to supply [hybrid] papayas for [the LLC] orders if such papaya is available;

■ Using trade secrets and confidential information owned by [the LLC] or [the Distributor];

■ Destroying, deleting, erasing, losing, hiding, altering, or modifying in any manner the electronic information, including emails, text messages, recordings, and other communications involving or mentioning [the Importer], [the Grower], [the LLC], [the Distributor] or any of its principals or employees, or accounts which have done business through [the LLC].

This interlocutory appeal followed.

## II. Discussion

In appellants' first issue, they essentially challenge either the legal sufficiency or the viability of all of the claims asserted by the Distributor. The claims that form the basis for most of the injunctive relief granted in this case may be divided into two categories:

● The claims for breaches of joint venture agreement, partnership agreement, and joint venture form the basis for the "exclusivity restrictions" (Restrictions 1 and 6) in the injunctive order.

● The claims for breach of fiduciary duty, aiding and abetting in the breach of fiduciary duty, Texas Uni-

4. It is noteworthy that Restrictions 2, 3, 4, and 5 use the terms "business," "accounts," and "business opportunity." Therefore, these restrictions affect more than just hybrid papayas.

form Trade Secrets Act, Texas Theft Liability Act, and tortious inference with contract form the basis for the "non-competition restrictions" (Restrictions 2–5 and 7) in the injunctive order.

The claims forming the basis for the exclusivity restrictions (Restrictions 1 and 6) are addressed in subsection B below; the claims forming the basis for the non-competition restrictions (Restrictions 2–5 and 7) are addressed in subsection C below.

In appellants' second issue, they argue that the parameters of the non-competition restrictions (Restrictions 2–5 and 7) are overbroad and unspecific. In light of our holdings regarding the first issue, we addressed this issue in subsection D below.

In appellants' third issue, they challenge the legally sufficiency of the evidence supporting an injunctive restriction relating to preservation of electronic information (Restrictions 8). We address this issue in subsection E below.

## A. Applicable Law

### 1. Temporary Injunction Elements

To obtain a temporary injunction, the applicant must plead and prove three elements: (1) a cause of action; (2) a probable right to relief; and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). To show a probable right to relief, the applicant is not required to establish that it will prevail at trial. *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993) (per curiam). The merits of the applicant's suit are not presented for review. *Davis v. Huey*, 571 S.W.2d 859, 861 (Tex. 1978); *Frontera Generation Ltd. P'ship v. Mission Pipeline Co.*, 400 S.W.3d 102, 108 (Tex. App.—Corpus Christi 2012, no pet.) (combined appeal & orig. proceeding).

Regarding the third element, an injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard. *Butnaru*, 84 S.W.3d at 204. " 'Disruption to a business can be irreparable harm. Moreover, assigning a dollar amount to such intangibles as a company's loss of clientele, goodwill, marketing techniques, and office stability, among others, is not easy.' ". *Intercont'l Terminals Co., LLC v. Vopak N. Am., Inc.*, 354 S.W.3d 887, 896 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (quoting *Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 228 (Tex. App.—Fort Worth 2009, pet. denied) (citations omitted)).

### 2. Standard of Review

We assess the trial court's ruling under the abuse of discretion standard. *Butnaru*, 84 S.W.3d at 204. The test for abuse of discretion is whether the trial court ruled arbitrarily, unreasonably, without regard to guiding legal principles, or without supporting evidence. *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998). As to ruling without supporting evidence, the trial court does not abuse its discretion if some evidence in the record reasonably supports the trial court's decision. *Butnaru*, 84 S.W.3d at 211. Under this standard, we draw all legitimate inferences from the evidence in a manner most favorable to the trial court's ruling. *Allied Capital Corp. v. Cravens*, 67 S.W.3d 486, 489 (Tex. App.—Corpus Christi 2002, no pet.). Under this standard, the legal and factual sufficiency of the evidence are not independent grounds of error, but are relevant factors in assessing whether the trial court abused its discretion. *Stewart Beach Condominium Homeowners Ass'n, Inc. v. Gili N Proper Inv., LLC*, 481 S.W.3d 336, 343 (Tex. App.—Houston [1st Dist.] 2015, no pet.)

## B. The Exclusivity Restrictions in the Temporary Injunction Order

Restrictions 1 and 6 of the temporary injunction order include the following exclusivity relief, mandating that appellants refrain from,

■ Distributing any [hybrid] papayas without such distribution going through [the LLC] and dividing proceeds as previously agreed;

. . . .

■ Refusing to supply [hybrid] papayas for [the LLC] orders if such papaya is available;

Appellants complain that these restrictions are premised on the trial court's finding of a partnership, joint venture, and joint enterprise between the Distributor, the Importer, and the LLC and that the Distributor presented no evidence on such theories. Appellants further complain that the period for the exclusivity provision in the revised operating agreement expired and the Distributor presented no evidence of a new contract that contained an exclusivity provision. The Distributor responds that the revised operating agreement is ambiguous and that such ambiguity, layered with the deference afforded to trial courts when issuing temporary injunctions, supports a finding of no abuse of discretion in granting the exclusivity restrictions.

### 1. Partnership

Appellants assert that the Distributor, the Importer, and the LLC expressly agreed in writing that they are not a partnership. We agree. As relevant to this question, both operating agreements provide,

The [LLC] shall, to the extent permissible, elect to be treated as a partnership for federal, state and local income tax purposes, and each Member and the [LLC] shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment, and no Member shall take any action inconsistent with such treatment. *The [LLC] shall not be deemed a partnership or joint venture for any other purpose.*

(Emphasis added.) Thus, the operating agreements reflect the Distributor and the Importer's intent that the LLC would be a limited liability company, not a partnership. *See Robbins v. Payne*, 55 S.W.3d 740, 748 (Tex. App.—Amarillo 2001, pet. denied) (declining to find an implied partnership where the parties' written agreement "evidence[d] an intent to form a corporation, and the record shows that a corporation was formed").

Furthermore, because the LLC was created under the business organizations code statute governing limited liability companies, by default it is not a partnership,

(c) An association or organization is not a partnership if it was created under a statute other than:

(1) this title and the provisions of Title 1 applicable to partnerships and limited partnerships;

(2) a predecessor to a statute referred to in Subdivision (1); or

(3) a comparable statute of another jurisdiction.

TEX. BUS. ORGS. CODE ANN. § 152.051(c) (West, Westlaw through Ch. 49, 2017 R.S.). The Distributor does not dispute that the LLC was in fact formed under "a statute other than" those listed in section 152.051(c), which suggests that it is "not a partnership." *See id.*; *see also Duncan v. Allen*, No. 9:15-CV-29, 2016 WL 4467674, at *5 (E.D. Tex. Aug. 24, 2016) (relying on section 152.051(c) to conclude that, absent any evidence of a partnership separate from the underlying limited liability company, there was no issue of fact as to the existence of a partnership).

■ In its statement of facts, the Distributor highlights two pieces of evidence where the parties refer to the LLC as a "partnership." We find this evidence lacking. First, Alford referred to the LLC as a partnership in describing its formation, testifying that when David approached him in 2010, David "offered us a proposed partnership. They said they wanted to incorporate." Alford further testified that "through negotiations ... we agreed to accept the partnership and entered into [a limited liability company]...." Second, after Lance made his March 2016 announcement ending the exclusive relationship, he wrote to Alford explaining,

> We appreciate the time and hard work that both partners have put into making [the LLC] successful. The experience of [the Distributor] in sales and marketing along with [the Importer] in production and knowledge of the produce market, is what has made [the LLC] work. It has been a good partnership for the last 6 years.

But, viewed in the light most favorable to the trial court's ruling, Lance's letter suggests a diplomatic gesture, not a formal reclassification of LLC's legal character.

The "term 'partner' is regularly used in common vernacular and may be used in a variety of ways," and "[r]eferring to ... a 'partner' in a colloquial sense is not legally sufficient evidence of expression of intent to form a business partnership." *Ingram v. Deere*, 288 S.W.3d 886, 900 (Tex. 2009). Here, the context in which the statements were made establishes that the parties' use of the term "partner" was colloquial, not legal. *See id.*

Absent something more, we conclude that the Distributor presented no evidence that conclusively negates the plain text of the business organizations code and the operating agreements, both of which require us to determine as a matter of law that the LLC was solely a limited liability company, not a partnership. *See* Tex. Bus. Orgs. Code Ann. § 152.051(c); *Robbins*, 55 S.W.3d at 748.

**2. Joint Enterprise and Joint Venture**

■ The same considerations lead us to hold that a limited liability company, such as the LLC, does not qualify for the overlapping labels of joint venture or joint enterprise. *Cf.* Tex. Bus. Orgs. Code Ann. § 152.051(b) ("An association of two or more persons to carry on a business for profit as owners creates a partnership, regardless of whether ... the association is called a 'partnership,' 'joint venture,' or other name."). "We see no legal or logical reason for distinguishing a joint venture from a partnership on the question of formation of the entity." *Ingram*, 288 S.W.3d at 894 n.2; *see also SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 451 (Tex. 2008) (defining, in the context of a products liability suit, joint venture and enterprise in analogous terms; "the essential elements" of both "a joint venture or joint enterprise" are "an agreement, a common purpose, a community of pecuniary interest, and an equal right of control").

**3. Contractual Exclusivity Provision and Ambiguity**

■ Appellants argue that Restriction 1 and 6 are contrary to the revised operating agreement on the ground that its exclusivity provision expired two years after it took effect, at the end of 2015. The exclusivity provision provides,

Article XV

BUSINESS OPERATIONS

15.1 Exclusive Contract for Distribution. [The LLC] shall serve as the sole and exclusive distributor of papayas exported into the United States by [the Importer] and/or other existing or, future compa-

nies of Lance Peterson and/or David Peterson pertaining in whole or in part to the growing, production, shipping or packaging of papayas. *This portion of the Agreement* shall apply for two years at which time the parties agree to meet to review the agreement and negotiate in good faith to renew the Business Operations terms of the Agreement.

(Emphasis added.)

In response, the Distributor contends that section 15.1 is ambiguous and that this ambiguity required the trial court to preserve the exclusivity provision because that was the status quo. First, the Distributor contends that within the "this portion of the Agreement shall apply for two years" provision, the phrase "this portion" is ambiguous and could refer only to other, unrelated sections of article XV, leaving the exclusivity provision without a definite time limit. Second, the Distributor contends that the phrase "shall apply for two years" is ambiguous. According to the Distributor, this phrase does not mean that the exclusivity provision "shall *expire after* two years," but instead means that it may be modified at that time.

■ We do not find section 15.1 ambiguous. A contract is not ambiguous if the contract's language can be given a certain or definite meaning. *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015). Here, each contested phrase is susceptible to a clear and definite reading. *See id.* As it is used here, the phrase "this portion" includes the sentence which immediately precedes it in the same paragraph: the exclusivity provision. *See Great Atl. & Pac. Tea Co., Inc. v. FTC*, 440 U.S. 69, 76, 99 S.Ct. 925, 59 L.Ed.2d 153 (1979) (holding that the phrase "this section" in a statute referred to the entire section in which the phrase was written); *see also*

*Schindler v. Thomas*, 434 S.W.2d 187, 189 (Tex. Civ. App.—Corpus Christi 1968, no writ) (using the phrase "this portion of the [agreement]" to refer to the immediately preceding sentence of our opinion wherein we had described a particular clause in an agreement). Thus, the exclusivity provision applied for two years.

Moreover, the latter phrase, "this portion of the Agreement *shall apply for two years*," contemplates an expiration of the relevant terms. *See Griffin Indus., Inc. v. Foodmaker, Inc.*, 22 S.W.3d 33, 35–36 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (finding that an agreement expired after two years under its own unambiguous provision that the agreement "shall remain in effect for a period of 24 months"); *see also Hines v. Ward Baking Co.*, 155 F.2d 257, 260 (7th Cir. 1946) (finding that there was "no ambiguity, no lack of certainty as to the meaning of the modified agreement," which provided that a certain clause "shall apply for" the duration of a contract period).

This plain reading is confirmed by the phrase "negotiate in good faith to renew the Business Operations terms," which suggests that the entirety of article XV, titled "Business Operations," expired after two years, thus requiring "renew[al]." Therefore, we agree with appellants that section 15.1 clearly and unambiguously provides that the exclusivity provision expired after two years' time, on December 31, 2015. Absent ambiguity, we construe the contract as a matter of law in favor of appellants. *See Plains Expl.*, 473 S.W.3d at 305.

### 4. Disposition

The Distributor presented legally insufficient evidence to support a probable right to relief against the Importer on its claims for partnership, joint venture, and joint enterprise, on which the exclusivity restrictions (Restrictions 1 and 6) in the

temporary injunction order are premised. *See Stewart Beach*, 481 S.W.3d at 343. In other words, we find no evidence in the record that could reasonably support the trial court's decision to grant injunctive relief premised on claims for partnership, joint venture, and joint enterprise, *see Butnaru*, 84 S.W.3d at 211, even when we draw all legitimate inferences from the record in a manner most favorable to the trial court's ruling. *See Allied Capital Corp.*, 67 S.W.3d 486 at 489. Accordingly, the trial court abused its discretion in granting the exclusivity restrictions (Restrictions 1 and 6). We sustain the first half of appellants' first issue, as reframed.

## C. The Non-Competition Restrictions in the Temporary Injunction Order

The second half of appellants' first issue, as reframed, deals with Restrictions 2–5 and 7 of the temporary injunction order, which prohibit appellants from,

 Soliciting or conducting business with [the Distributor's] customers or growers;

 Soliciting, directly or indirectly, accounts of [the LLC] or [the Distributor];

 Diverting any business opportunity away from [the LLC] or [the Distributor];

 Directing any business opportunity away from [the LLC] or [the Distributor];

. . . .

 Using trade secrets and confidential information owned by [the LLC] or [the Distributor];

The parties do not dispute that these restrictions are premised on the Distributor's claims for (1) breach of fiduciary duty, (2) Texas Uniform Trade Secrets Act, (3) Texas Theft Liability Act, (4) tor-

tious interference with contractual relations, and (5) "aiding and abetting in the breach of fiduciary duty." We now address appellants' arguments regarding these causes of action.

### 1. Breach of Fiduciary Duty

 Assuming without deciding that there is a breach of fiduciary duty under the facts of this case, appellants argue that the Distributor presented no evidence that the Importer or Lance breached a fiduciary duty owed to the LLC.[5] Specifically, appellants argue that "the only act described by the witnesses and cited by the temporary injunction order was [Lance's] announcement as president of [the Importer] that it had decided to start selling [the hybrid] papayas directly to customers."

Instead of referencing evidence supporting the breach of fiduciary duty claim lodged against the Importer or Lance, the Distributor construes appellants' argument as "narrow" and based on "the exclusivity [provision having] expired and that the [revised operating agreement] authorized competition." The Distributor contends that we should find appellants' only basis for why no breach of fiduciary duty occurred sufficiently refuted on the ground that "the exclusivity [provision] remains in effect" and the revised operating agreement "does not authorize competition with [the LLC] through the use of its property." In other words, the Distributor bases its argument entirely on our disposition regarding the exclusivity restrictions in the temporary injunction order.

We agree that the order's non-competition restrictions cannot be premised on the Distributor's breach of fiduciary duty claim because we find that the exclusivity provision in the revised operating agree-

---

**5.** The elements of a claim for breach of fiduciary duty are (1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages. *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017).

ment expired on December 31, 2015. *See Butnaru*, 84 S.W.3d at 204. Even if that were not the case, the Distributor fails to reference any evidence that supports the breach element of a breach of fiduciary duty claim, if any, on the part of the Importer or Lance. *See First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017).

■ Moreover, had the Distributor highlighted the evidence regarding a claim under the Texas Uniform Trade Secrets Act, analyzed below, and asserted that it could be used to satisfy the breach element of a breach of fiduciary duty claim, such an assertion would fail. The gravamen of the Distributor's breach of fiduciary duty claim duplicates its claim based on the Texas Uniform Trade Secrets Act. Specifically, the Distributor's breach of fiduciary duty claim alleges,

> By diverting [the LLC's] accounts and business for [the Importer's] own benefit, by using confidential and proprietary information owned by [the LLC] against the interests of [the LLC], and by soliciting [the LLC's] accounts and employees, [the Importer] and [Lance] are engaging in serious breaches of their fiduciary duty to [the LLC].

The Texas Uniform Trade Secrets Act generally "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." TEX. CIV. PRAC. & REM. CODE ANN. § 134A.007(a) (West, Westlaw through Ch. 49, 2017 R.S.).

■ There are few Texas cases analyzing the Texas Uniform Trade Secrets Act's preemption provision, but other cases analyzing similar provisions of the applicable Uniform Trade Secrets Acts are instructive. In *Smithfield Ham & Prod. Co. v. Portion Pac, Inc.*, 905 F.Supp. 346, 348 (E.D. Va. 1995), the court explained that "[t]he plain language of the preemption provision indicates that the law was in-

tended to prevent inconsistent theories of relief for the same underlying harm by eliminating alternative theories of common law recovery which are premised on the misappropriation of a trade secret." Where a claim is based on a misappropriation of a trade secret, then it is preempted by the Texas Uniform Trade Secrets Act. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 134A.007(a); *see, e.g., Thomas Betts Corp. v. Panduit Corp.*, 108 F.Supp.2d 968, 972 (N.D. Ill. 2000) (concluding that a breach of fiduciary duty claim was preempted because "[t]he evidence is substantial that the confidential sales data and related information" allegedly taken "constitute trade secrets under the statute"); *see also On–Line Techs., Inc. v. Bodensee-werk Perkin–Elmer*, 386 F.3d 1133, 1145 (Fed. Cir. 2004) (looking to a plaintiff's pleaded allegation of fraud, determining that it was based on misappropriation of trade secrets, and affirming trial court's granting of summary judgment on preemption under Connecticut's Uniform Trade Secret Act).

In this case, the Distributor's breach of fiduciary duty claim duplicates its alleged violation of the Texas Uniform Trade Secrets Act. Appellants could not "divert[ ] [the LLC's] accounts and business" or "solicit[ ] [the LLC's] accounts and employees" without the use of alleged trade secrets. Accordingly, the preemption provision in the Texas Uniform Trade Secrets Act precludes the Distributor's breach of fiduciary duty claim from serving as a basis for temporary injunctive relief.

## 2. Texas Uniform Trade Secrets Act Claim

Appellants do not challenge that some evidence was presented that would theoretically sustain a claim under the Texas Uniform Trade Secrets Act (TUTSA), TEX. CIV. PRAC. & REM. CODE ANN. § 134A.003(a) (West, Westlaw through Ch. 49, 2017 R.S.).

Instead, appellants argue that the non-competition provisions are contrary to provisions in the operating agreements allowing the Importer access to the LLC's books and records and permitting "other business." [6] Appellants reference two provisions of the operating agreements—"6.4 Inspection of Records" and "3.5 Other Business"—in support of their contention. The Distributor responds that the trial court did not abuse its discretion by restraining competitive conduct on the ground that it presented legally sufficient evidence of claims for the TUTSA. We agree with the Distributor.

### a. Applicable Law

The TUTSA provides that actual or threatened misappropriation of trade secrets may be enjoined. *Id.* Under TUTSA, a trade secret is defined as,

> information, including a formula, pattern, compilation, program, device, method, technique, process, financial data, or list of actual or potential customers or suppliers, that:
>
> (A) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (B) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.* § 134A.002(6) (West, Westlaw through Ch. 49, 2017 R.S.).

TUTSA defines "misappropriation" in six discrete forms:

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret

was acquired by improper means [Form 1]; or

> (B) disclosure or use of a trade secret of another without express or implied consent by a person who:
>
> (i) used improper means to acquire knowledge of the trade secret [Form 2];
>
> (ii) at the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was:
>
> (a) derived from or through a person who had utilized improper means to acquire it [Form 3];
>
> (b) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use [Form 4]; or
>
> (c) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use [Form 5]; or
>
> (iii) before a material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake [Form 6].

*Id.* § 134A.002(3). Each of these forms of "misappropriation" involve some combination of acquisition, disclosure, or use of a trade secret, paired with other circumstances. *See id.*

### b. Inspection of Records

■ The first provision of the operating agreements that appellants reference provides,

> 6.4 Inspection of Records. All [the LLC] books and records shall be kept in the principal place of business of the [LLC] and shall be

---

**6.** Unlike the arguments related to the exclusivity restrictions, appellants do not assail the legal sufficiency of the claims that premise the non-competition restrictions in the temporary injunction order.

open to inspection and copying by the Members or their authorized representatives at all reasonable times.

Appellants argue that this provision shows the Distributor's consent for the Importer to take any trade secrets belonging to the LLC. In the language of TUTSA, these trade secrets therefore could not have been wrongfully acquired, thus ruling out four of the six forms of misappropriation, which rely on flaws in the acquisition of trade secrets to demonstrate misappropriation. *See id.* § 134A.002(3)(A), (B)(i), (B)(ii)(a), (B)(iii).

Contrary to appellants' interpretation, we cannot conclude that provision 6.4 gives the Importer the absolute right to take all of the LLC's confidential information without regard to any trade secret protection. Article VI of the operating agreements is titled "Accounting and Reports," and it also contains provisions regarding books and records, financial statements, and tax returns. On the other hand, provision 3.4(a) defines "private, secret, and confidential information" as "relating to such matters as membership agreements, membership lists, intellectual property, finances, methods of operation and competition, pricing, marketing plans and strategies, equipment, and operational requirements and information concerning personnel, clients, independent contractors, and suppliers of the Company." And provision 3.4(a) mandates that "[e]ach Member shall keep confidential" the "private, secret, and confidential information." Read in conjunction, provision 6.4 allows inspection, but provision 3.4(a) mandates confidentiality. Furthermore, there is no indication that provision 6.4 undercuts the confidentiality requirement in provision 3.4(a).

### c. Other Business

■ The second provision of the operating agreements that appellants reference provides,

3.5 <u>Other Business</u>. Except as prohibited by Section 3.4 above, the Members and the Manager hereby acknowledge and agree that each Manager and Member *may engage in any activity whatsoever (as an owner, employee, consultant or otherwise) whether or not such activity competes with or is enhanced by the Company's business and affairs*, and no Manager or Member shall be liable or accountable to the Company or any other Manager or Member for any income, compensation, or profit that such Manager or Member may derive from such activity. Further, no Manager or Member shall be liable or accountable to the Company or any other Manager or Member for *failure to disclose or make available to the Company any business opportunity* that such Manager or Member becomes aware of in such Manager's or Member's capacity as a Manager or Member or otherwise.

(Emphasis added.) Appellants argue that this provision shows the Distributor's consent to the use of trade secrets. Appellants' argument fails for three reasons.

First, provision 3.5 does not allow members to use the LLC's trade secrets. To the contrary, provision 3.5 begins with the phrase "except as prohibited by [Provision] 3.4," a provision which obligated the members to maintain the confidentiality of the LLC's information. That is, the member's right to compete was made expressly subject to its duties regarding the LLC's confidential information. As a remedy for any breach of confidences, provision 6.4 provided that a remedy at law will be inadequate

and that the LLC "shall be entitled to an injunction" restraining the breach.

Second, appellants' interpretation of provision 3.5 does not comport with another provision of the operating agreements which state that "[a]ll property owned by [the LLC], tangible or intangible, shall be deemed to be owned by [the LLC] as an entity, and no Member shall have any ownership of such property individually." Likewise, the business organizations code provides that the member of a limited liability company or an assignee of a membership interest in a limited liability company does not have an interest in any specific property of the company. Tex. Bus. Orgs. Code Ann. § 101.106(b) (West, Westlaw through Ch. 49, 2017 R.S.). Thus, any trade secrets belonged to the LLC.

Third, provision 3.5 says nothing of allowing appellants to "take" existing business opportunities. Rather, it speaks only of limiting any fiduciary duty to "disclose" business opportunities to other members, see Nguyen v. Hoang, 507 S.W.3d 360, 379 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (discussing partner's duty to disclose business opportunities). This provision does not apply to the Importer's actions towards the LLC's customers; the Importer would surely have no need to "disclose" to the LLC the very customers who were, at that time, doing business with the LLC.

### 3. Texas Theft Liability Act

■■■ The Distributor alleged violations of the Texas Theft Liability Act (TTLA) against the Importer and Lance. See Tex. Civ. Prac. & Rem. Code Ann. § 134.005 (West, Westlaw through Ch. 49, 2017 R.S.). Appellants rely on Glattly v. Air Starter Components, Inc., 332 S.W.3d 620, 641 (Tex. App.—Houston [1st Dist.] 2010, pet. denied), as support for their argument that the TTLA does not authorize injunctive relief. The Distributor does not respond to appellants' argument. Appellants correctly reference Glattly for the proposition "that

the Texas Theft Liability Act does not authorize injunctive relief." Id.

### 4. Tortious Interference with Existing and Prospective Contractual Relations

The Distributor alleged that the Importer and Lance "willfully and intentional interfered with [the LLC's] and [the Distributor's] existing and prospective contractual relationships . . . ." As pleaded, the Distributor's tortious interference claims address two different kinds of contractual relationships: existing and prospective. Appellants challenge the legally sufficiency of both.

#### a. Applicable Law

■■■ The elements of tortious interference with a contract are: (1) an existing contract subject to interference; (2) a willful and intentional act of interference with the contract; (3) that proximately caused the plaintiff's injury; and (4) caused actual damages or loss. Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc., 29 S.W.3d 74, 77 (Tex. 2000). Tortious interference with prospective contractual relations includes continuing business relations. Compare Prudential Ins. Co. of Am., 29 S.W.3d at 77 with Faucette v. Chantos, 322 S.W.3d 901, 915 (Tex. App.—Houston [14th Dist.] 2010, no pet.). The elements of a claim for tortious interference with prospective business relations are:

(1) a reasonable probability that the parties would have entered into a contractual relationship;

(2) an "independently tortious or unlawful" act by the defendant that prevented the relationship from occurring;

(3) the defendant did such act with a conscious desire to prevent the relationship from occurring or knew that the interference was certain or substantially certain to occur as a result of his conduct; and

(4) the plaintiff suffered actual harm or damage as a result of the defendant's interference.

*Allied Capital,* 67 S.W.3d at 491; *Faucette,* 322 S.W.3d at 914.

### b. Analysis

■ In *Funes v. Villatoro,* an opinion referenced by appellants, the Fourteenth Court of Appeals wrote that "[t]o prevail on a tortious interference claim, a plaintiff must present evidence that the defendant interfered with a *specific* contract." 352 S.W.3d 200, 213 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (emphasis added). Appellants contend that the Distributor presented no evidence of a *specific* contract with which the Importer or Lance interfered. On appeal, the Distributor has not referenced a specific contract. We conclude that there is legally insufficient evidence of tortious interference with *existing* contractual relations.

■ As for *prospective* contractual relations, the Distributor argues that there is evidence that the Importer and Lance caused the LLC's and the Distributor's customers to cease doing business with them and prevented the LLC and the Distributor from continuing prospective relations by refusing to continue to supply hybrid papayas.

The Distributor's second argument fails. In *Faucette,* the court wrote that "harm that results only from lawful competition is not compensable by the interference tort." 322 S.W.3d at 914 (quoting *Wal-Mart Stores, Inc. v. Sturges,* 52 S.W.3d 711, 727 (Tex. 2001)). Similarly, the Importer was under no contractual obligation to continue supplying the LLC with hybrid papayas after the exclusivity period expired and the Distributor presented no evidence or argument of any other obligation to continue supplying it. *Id.*

Our holding as to the Distributor's second argument forestalls its first. Even if

an employee of the Importer used the LLC's customer list to solicit customers away from the LLC, urging them to instead buy directly from the Importer, the Distributor presented no evidence that it could supply orders for hybrid papayas from other importers and growers. Thus, there is no evidence that the Distributor would have suffered any actual harm of damage because, on the record before us, the Distributor would have no hybrid papayas to sell. *See Allied Capital,* 67 S.W.3d at 491; *Faucette,* 322 S.W.3d at 914.

### 5. Aiding and Abetting in the Breach of Fiduciary Duty

■ The only claim lodged against the Grower was "aiding and abetting in the breach of fiduciary duty." Appellants argue that "since there is no evidence that Lance or [the Importer] breached a fiduciary duty owed to [the LLC], there is no evidence [the Grower] aided and abetted a breach." The Distributor responds by arguing that Lance's testimony established that the Importer and the Grower are his companies and that Lance dictates their business practices. The Distributor further contends that there was evidence Lance has made his living by farming in Mexico for several years and that such evidence supports the trial court's implicit finding that the Importer and the Grower were "Lance's left and right hands."

Generally, when a breach of fiduciary duty claim fails, so should an aiding and abetting in the breach of fiduciary duty claim, to the extent one exists in Texas. *Cf. Anderton v. Cawley,* 378 S.W.3d 38, 54 (Tex. App.—Dallas 2012, no pet.) (reversing a no-evidence summary judgment on appellants' claims for aiding and abetting breach of fiduciary duty where a trial court erroneously granted summary judgment on a breach of fiduciary duty claim); *see also First United Pentecostal Church of Beaumont,* 514 S.W.3d at 224 ("noting

that [the Supreme Court of Texas] has not expressly decided whether Texas recognizes a cause of action for aiding and abetting"). The Distributor's reference to Lance's relationship with the Importer and the Grower does not negate the general rule that where there is no evidence of a breach of fiduciary duty there can be no aiding and abetting of a breach of fiduciary duty.

### 6. Disposition

We sustain in part and overrule in part the second half of appellant's first issue, as reframed. The Distributor presented legally insufficient evidence to support a probable right to relief on its claims for breach of fiduciary duty, TTLA, tortious interference with existing and prospective contractual relations, and aiding and abetting in the breach of fiduciary duty, on which the non-competition restrictions (Restrictions 2–5 and 7) in the temporary injunction order are premised. *See Stewart Beach*, 481 S.W.3d at 343. In other words, we find no evidence in the record that could reasonably support the trial court's decision to grant injunctive relief premised on claims for breach of fiduciary duty, if any, TTLA, tortious interference with existing and prospective contractual relations, and aiding and abetting in the breach of fiduciary duty,[7] *see Butnaru*, 84 S.W.3d at 211, even when we draw all legitimate inferences from the record in a manner most favorable to the trial court's ruling. *See Allied Capital Corp.*, 67 S.W.3d 486 at 489. Accordingly, the trial court abused its discretion in granting the non-competition restrictions (Restrictions 2–5 and 7) to the extent that they are premised on claims for breach of fiduciary duty, TTLA, tortious interference with existing and prospective contractual relations, and aiding

and abetting in the breach of fiduciary duty.

On the other hand, drawing all legitimate inferences from the record in a manner most favorable to the trial court's ruling, *see id.*, we find some evidence in the record that could reasonably support the trial court's decision to grant injunctive relief premised on the Distributor's TUTSA claim. *See Butnaru*, 84 S.W.3d at 211.

### D. Parameters of the Non-Competition Restrictions

In light of the evidence presented, only the TUTSA claim could have served as a basis for injunctive relief. This coupled with our dissolving of the exclusivity restrictions necessarily affects the trial court's discretion in crafting the non-competition restrictions. *Cf. Harbor Perfusion, Inc. v. Floyd*, 45 S.W.3d 713, 718 (Tex. App.—Corpus Christi 2001, no pet.) (noting that enjoining a defendant from conducting lawful activities or from exercising legal rights constitutes an overly-broad injunction and an abuse of discretion). In other words, given that the exclusivity provision in the revised operating agreement has expired, the Importer is free to compete against the LLC, with the exception of injunctive relief that is appropriately related to the TUTSA claim.

With these considerations in mind, we turn to appellants' second issue in which they argue that many restrictions in the injunction are overly broad and prevent them from conducting lawful activities that are unrelated to the alleged harm. Appellants also contend the injunctive restrictions are insufficiently specific and in violation of rule of civil procedure 683. *See* Tex. R. Civ. P. 683. According to appellants, such deficiencies provide them with no

---

**7.** The only claim asserted against the Grower was for aiding and abetting in the breach of fiduciary duty.

clear indication of what actions will violate the temporary injunction.

### 1. Applicable Law

#### a. Overbreadth

We review the scope of an injunction for an abuse of the trial court's discretion. *See Holubec v. Brandenberger*, 214 S.W.3d 650, 658 (Tex. App.—Austin 2006, no pet.) (reviewing the scope of a permanent injunction for abuse of discretion); *see also Harbor Perfusion, Inc.*, 45 S.W.3d at 718 (reviewing the scope of a temporary injunction for abuse of discretion). "A trial court abuses its discretion by entering an overly-broad injunction which grants more relief than a plaintiff is entitled to by enjoining a defendant from conducting lawful activities or from exercising legal rights." *Harbor Perfusion*, 45 S.W.3d at 718 (quoting *Fairfield Estates LP v. Griffin*, 986 S.W.2d 719, 723 (Tex. App.—Eastland 1999, no pet.)) (quotation and editorial marks omitted). Where a party's acts are divisible, and some acts are permissible and some are not, an injunction should not issue to restrain actions that are legal or about which there is no asserted complaint. *RCI Entm't (San Antonio), Inc. v. City of San Antonio*, 373 S.W.3d 589, 603 (Tex. App.—San Antonio 2012, no pet.); *Webb v. Glenbrook Owners Ass'n, Inc.*, 298 S.W.3d 374, 384 (Tex. App.—Dallas 2009, no pet.). But an injunction must be broad enough to prevent a repetition of the wrong sought to be corrected. *RCI Entm't*, 373 S.W.3d at 603.

#### b. Specificity

Rule 683 provides, among other things, that "every order granting an injunction" shall be specific in terms and shall describe in reasonable detail and not by reference to the complaint or other document, the acts sought to be restrained. *See* TEX. R. CIV. P. 683. An injunction decree must be as definite, clear, and precise as possible, and when practicable it should inform the defendant of the acts he is restrained from doing, without calling on him for inferences or conclusions about which persons might well differ. *Adust Video v. Nueces Cnty.*, 996 S.W.2d 245, 250 (Tex. App.—Corpus Christi 1999, no pet.) (quoting *San Antonio Bar Ass'n v. Guardian Abstract & Title Co.*, 156 Tex. 7, 15, 291 S.W.2d 697, 702 (1956)). The rule's purpose is to ensure that parties are adequately informed of the acts they are enjoined from doing and the reasons for the injunction. *In re Chaumette*, 456 S.W.3d 299, 305 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (orig. proceeding). The requirements of the civil procedure rule on the form and scope of an injunction are mandatory and must be strictly followed. *Qwest Commc'ns Corp. v. AT&T Corp.*, 24 S.W.3d 334, 337 (Tex. 2000) (per curiam).

### 2. Analysis

#### a. Non-Competition Restrictions 2 and 3

Appellants challenge the breadth and specificity of the provisions in Restrictions 2 and 3, which prohibit appellants from

- Soliciting or conducting business with [the Distributor's] *customers* or *growers*;
- Soliciting, directly or indirectly, *accounts* of [the LLC] or [the Distributor];

(Emphasis added.) Appellants first argue that there is nothing to identify any of the Distributor's and the LLC's "growers," "customers," and "accounts," and the temporary injunction therefore violates rule 683's specificity requirement. We agree with appellants because the record combined with the operating agreements requires greater specificity of these terms.

In questioning Alford, the Distributor's counsel stated, "Obviously, buyers of produce isn't something secret." Alford acknowledged as much, but he contended

that culling fifty customers for papayas and seventy-five customers for other items out of a potential customer base of between 10,000 to 12,000 was "quite an advantage." Appellants seem to have a different number in mind. They offered and the trial court admitted "Defendant's Exhibit 15," which purports to be an LLC document titled "Sales by Customer Summary, November 2015 through May 2016." That document contains approximately twenty-four "customers." Thus, the record contains a discrepancy in the number of LLC customers between Alford's testimony and the documentary evidence sponsored by appellants. Moreover, because the exclusivity period has expired, appellants may sell the hybrid papayas (or any other produce) so long as they do not misappropriate the LLC's confidential information. Because appellants have no clear basis to know which acts they are restrained from doing, those portions of the injunction which refer to the Distributor's or the LLC's unidentified "growers," "customers," or "accounts" are fatally vague. *See* Tex. R. Civ. P. 683; *Adust Video*, 996 S.W.2d at 250.

Appellants next argue that "as written, these [restrictions] appear to prohibit even mass advertising that discloses no trade secrets and is not intended for a particular customer." Again, we agree. Because the exclusivity period has expired, appellants may sell the hybrid papayas (or any other produce) so long as they do not misappropriate the LLC's confidential information. Accordingly, any non-competition restriction cannot prohibit the Importer from advertising, so long as such advertising does not disclose or use confidential information. *See Harbor Perfusion*, 45 S.W.3d at 718.

### b. Non-Competition Restrictions 4 and 5

■ Appellants challenge the breadth and specificity of the provisions in Restrictions 4 and 5, which prohibit appellants from,

■ Diverting any business opportunity away from [the LLC] or [the Distributor];

■ Directing any business opportunity away from [the LLC] or [the Distributor];

Appellants argue that Restrictions 4 and 5 prohibit lawful conduct and that they "bar the appellants from doing business with any potential customer or grower even if those individuals have never heard of [the LLC] or [the Distributor]." The Distributor responds that under *San Antonio Bar Association v. Guardian Abstract & Title Company*, 156 Tex. 7, 291 S.W.2d 697, 702 (1956), "an injunction decree must be as definite, clear and precise as possible and *when practicable*" and that it should not "be greatly concerned with rights of the defendants that are asserted largely in the *abstract*." (Emphasis added.)

Given that the exclusivity provision of the revised operating agreement has expired and Restrictions 1 and 6 must be dissolved, Restrictions 4 and 5 are overly broad to protect the Distributor regarding the potential TUTSA claim. *See Harbor Perfusion*, 45 S.W.3d at 718.

### c. Non-Competition Restriction 7

■ Appellants challenge the breadth and specificity of Restriction 7, which prohibits appellants from "using trade secrets and confidential information owned by [the LLC] or [the Distributor]." They contend that this restriction is void for vagueness because "trade secrets" is undefined. We agree.

Before the injunction order pronounces the restrictions, it recites, "Gumus was sent inside of [the LLC's] operations to learn how [the LLC] was being operated and to obtain customer lists, shipper lists, carrier lists, grower lists, contact names

and information, preferred services, rates, revenues, profits, *and* other confidential information." (Emphasis added.) From the text of the injunction order and the use of "and," a reasonable reader would believe that there is "other confidential information" in addition to "customer lists, shipper lists, carrier lists, grower lists, contact names and information, preferred services, rates, revenues, [and] profits." Thus, instead of defining "confidential information," the injunction order leads one to wonder what is the "other confidential information" that the trial court believes exists. *Cf. IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191, 202 (Tex. App.—Fort Worth 2005, no pet.) (holding that the meaning of "Bell trade secrets and information" is apparent from the text of the injunction where it identifies, among other things, the "information at issue" as information pertaining to Bell's 206B and OH-58 helicopter blades).

### 3. Disposition

We sustain appellants' second issue, as reframed.

### E. Preservation of Electronically Stored Information

In what we consider appellants' third issue, they argue that Restriction 8 of the temporary injunction order was "never raised at the hearing on the application for temporary injunction" and that the Distributor produced legally insufficient evidence to support injunctive relief prohibiting the destruction of electronic information. Restriction 8 of the temporary injunction order prohibits appellants from,

> Destroying, deleting, erasing, losing, hiding, altering, or modifying in any manner the electronic information, including emails, text messages, recordings, and other communications involving or mentioning [the Importer], [the Grow-

er], [the LLC], [the Distributor] or any of its principals or employees, or accounts which have done business through [the LLC].

In response, the Distributor argues that Restriction 8 "was a necessary component to the injunctions order's overall purpose of providing adequate protection to [it's] legal rights." The Distributor cites *Halliburton Energy Services, Inc. v. Axis Technologies, LLC*, 444 S.W.3d 251, 257 (Tex. App.—Dallas 2014, no pet.) in support of its argument.

First, assuming, without deciding, that Restriction 8 is related to the Distributor's claim under TUTSA, the only claim that survives appellants' challenge, the Distributor presented no evidence or argument of a probable, imminent, and irreparable injury in the interim stemming from the acts restrained in Restriction 8. *See Butnaru*, 84 S.W.3d at 204.

Second, in *Halliburton*, a jury found that the defendant had misappropriated trade secrets and then the trial court ordered the defendant to provide the plaintiff with copies of all electronically stored or maintained information relating to the trade secret. 444 S.W.3d at 255. Unlike in *Halliburton*, appellants have not been adjudicated trade-secret misappropriators. Therefore, *Halliburton* is distinguishable and under the facts of this case cannot serve as a basis for issuing Restriction 8.

Third, concerns regarding spoliation are governed by Texas common law. *See generally, Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 19–22 (Tex. 2014) (laying out the general framework governing spoliation findings and remedies). The issuance of Restriction 8, without any evidence or argument supporting it, is a departure from the guidance on spoliation provided by *Aldridge. See id.*

852

Accordingly, the trial court abused its discretion by issuing Restriction 8. We sustain appellants' third issue, as reframed.

### III. CONCLUSION

The Importer is correct in that the exclusivity provision in the revised operating has expired and it is no longer under a contractual obligation to supply the LLC with hybrid papayas. However, the Distributor is correct in that the LLC is technically still in existence and, so long as it exists, its trade secrets must be safeguarded by all members.

We reverse the trial court's temporary injunction order, dissolve it, and render a denial of the following restrictions:

■ Distributing any [hybrid] papayas without such distribution going through [the LLC] and dividing proceeds as previously agreed;

. . . .

■ Diverting any business opportunity away from [the LLC] or [the Distributor];

■ Directing any business opportunity away from [the LLC] or [the Distributor];

■ Refusing to supply [hybrid] papayas for [the LLC] orders if such papaya is available;

■ Destroying, deleting, erasing, losing, hiding, altering, or modifying in any manner the electronic information, including emails, text messages, recordings, and other communications involving or mentioning [the Importer], [the Grower], [the LLC], [the Distributor] or any of its principals or employees, or accounts which have done business through [the LLC].

We remand, for further proceedings consistent with this opinion, the following restrictions:

■ Soliciting or conducting business with [the Distributor's] customers or growers;

■ Soliciting, directly or indirectly, accounts of [the LLC] or [the Distributor]; [and]

. . . .

■ Using trade secrets and confidential information owned by [the LLC] or [the Distributor];

On remand, the trial court is instructed to redefine "soliciting" so as to not prohibit mass advertising. The trial court is also instructed to redraft these restrictions by defining "growers," "customers," "accounts," "trade secrets," and "confidential information."