

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00006-CV

_____

JESSEY CHI HUA LEE; JOANDERSON CAPITAL, LLC.; JIM K. LEE; AND
CHEN L. "JENNY" LEE, Appellants

V.

CRYSTAL LINH HOANG LEE, Appellee

On Appeal from the 367th District Court
Denton County, Texas
Trial Court No. 15-04017-367

Before Sudderth, C.J.; Gabriel and Birdwell, JJ.
Memorandum Opinion by Justice Gabriel

**MEMORANDUM OPINION**

This is an appeal from the trial court's property division incident to the divorce of appellant Jessey Chi Hua Lee and appellee Crystal Linh Hoang Lee. We affirm in part and reverse and remand in part.

## I. BACKGROUND

Jessey and Crystal married on June 18, 2011. Nearly four years later, Jessey filed a petition for divorce, and Crystal filed a counterpetition shortly thereafter. The case proceeded to a bench trial that commenced on May 31, 2016. This appeal concerns only the trial court's division of the marital property, so we confine our discussion of the facts accordingly.

One of the main disputes between Jessey and Crystal concerning the division of marital property was whether an interest Jessey had obtained in a California limited liability company called JoAnderson Capital, LLC was community property or Jessey's separate property. According to Jessey, he and someone named Richard Huang had formed JoAnderson Capital on April 2, 2014, for the sole purpose of purchasing and holding a single asset—a beach house in California—which would serve as a rental property. Jessey stated that JoAnderson Capital acquired the California beach house on April 23, 2014. Pertinent to this appeal, it is undisputed that during the marriage, Crystal received $24,341 in rental income from the California beach house.

Jessey maintained that in forming JoAnderson Capital, he had obtained a forty percent interest in the company by making a capital contribution of just under

$900,000 and that Huang owned the remaining sixty percent interest. Jessey said that his parents, appellants Jim K. Lee and Chen L. "Jenny" Lee, eventually acquired Huang's sixty percent interest in JoAnderson Capital. Jessey further asserted that 99.5% of the funds he used to make his capital contribution came from money he had inherited from his grandparents, while the remaining 0.5% had come from funds belonging to the marital estate. Thus, Jessey claimed that 99.5% of a forty percent interest in JoAnderson Capital was his separate property and that only 0.5% of the forty percent interest was community property that was subject to division by the trial court.

Crystal had a markedly different view. During their marriage, she and Jessey had formed LF Enterprises, LLC, a company that supplied furniture to residential furniture retailers around the world. She asserted that the money Jessey had used to acquire the interest in JoAnderson Capital had actually come from revenue generated from LF Enterprises and, thus, Jessey's interest in JoAnderson Capital belonged to the community estate. Crystal submitted an inventory in which she indicated that Jessey owned 100% of JoAnderson Capital when it was formed and that the entire company, which she valued at $2.25 million, belonged to the community estate.

On August 1, 2016, the trial court emailed Jessey's and Crystal's counsel a letter ruling regarding the division of their marital property. In the letter ruling, the trial court stated it had decided to characterize the $24,341 in rental payments Crystal had received as community property. The trial court also indicated that it had determined

3

Jessey held a 50% interest in JoAnderson Capital and that it had found the interest was community property.

On August 15, 2016, Jim, Jenny, and appellant JoAnderson Capital moved to intervene. They alleged that Jim and Jenny owned a 60% interest in JoAnderson Capital and that consequently, a decision by the trial court finding Jessey and Crystal's community estate held a 50% interest in JoAnderson Capital would improperly divest Jim and Jenny of 10% of their collective interest in the company. The intervenors also alleged that the $24,341 in rental payments Crystal received was actually rental income that belonged to JoAnderson Capital and that consequently, the trial court's decision to find those funds belonged to Jessey and Crystal's community estate would improperly divest JoAnderson Capital of its business income.

The trial court signed a final decree of divorce on August 30, 2016, in which it divided Jessey and Crystal's marital estate in accordance with its letter ruling. Three aspects of the trial court's property division are noteworthy here. First, the trial court found that the marital estate owned half of the overall value of JoAnderson Capital, determined that half of JoAnderson Capital's overall value was $1,101,578, and split that amount equally between Jessey and Crystal. Second, the trial court awarded Crystal the $24,341 she had received from renting out the California beach house. And third, the trial court awarded Crystal a money judgment against Jessey in the amount of $600,789 as "part of the division of community property between" them.

Jessey and the intervenors filed motions for new trial, which the trial court granted. In its order granting Jessey's motion for new trial, the trial court set aside the property division it had made in the August 30, 2016 decree and ordered that it would "retry the characterization of JoAnderson Capital, LLC and redetermine the division of the marital and separate estates if needed." After conducting a new bench trial on that issue, the trial court signed a final decree of divorce on October 5, 2017, but did not change any part of the three above-noted areas of property division that it had made in the August 30, 2016 decree.

Jessey and the intervenors requested findings of fact and conclusions of law, and the trial court filed its findings and conclusions on November 6, 2017. Jessey and the intervenors timely appealed, with Jessey raising five issues and the intervenors raising two.

## II. STANDARD OF REVIEW

All of the issues in this appeal challenge the trial court's division of Jessey's and Crystal's marital estate incident to their divorce. A trial court is charged with dividing a marital estate in a "just and right" manner, considering the rights of both parties. Tex. Fam. Code Ann. § 7.001; *Boyd v. Boyd*, 131 S.W.3d 605, 610 (Tex. App.—Fort Worth 2004, no pet.). A trial court has wide discretion in dividing the marital estate upon divorce, and thus we will not disturb the trial court's division of the marital estate on appeal unless the complaining party demonstrates from evidence in the record that the division was so unjust and unfair as to constitute an abuse of

5

discretion. *Neyland v. Raymond*, 324 S.W.3d 646, 649 (Tex. App.—Fort Worth 2010, no pet.). A trial court abuses its discretion if it acts without reference to any guiding rules or principles; in other words, a trial court abuses its discretion if it acts arbitrarily or unreasonably. *See Boyd*, 121 S.W.3d at 610.

In reviewing a marital property division, the abuse of discretion standard of review overlaps with the traditional civil sufficiency standards of review; thus, legal and factual sufficiency are not independent grounds of error, but they are relevant factors in assessing whether the trial court abused its discretion. *Neyland*, 324 S.W.3d at 649. To determine whether there has been an abuse of discretion because the evidence is legally or factually insufficient to support the trial court's decision, we engage in a two-pronged inquiry: (1) did the trial court have sufficient evidence upon which to exercise its discretion, and (2) did the trial court err in its application of that discretion? *Id.* The applicable sufficiency review comes into play with regard to the first question. *Id.* at 649–50. We then proceed to determine whether, based on the elicited evidence, the trial court made a reasonable decision. *Id.* at 650.

A trial court's findings of fact have the same force and dignity as a jury's answers to jury questions, and we review the legal and factual sufficiency of the evidence supporting those findings using the same standards that we apply to jury findings. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991); *see also MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 663 n.3 (Tex. 2009). When the appellate record contains a

reporter's record, findings of fact on disputed issues are not conclusive and may be challenged for evidentiary sufficiency. *Super Ventures, Inc. v. Chaudhry*, 501 S.W.3d 121, 126 (Tex. App.—Fort Worth 2016, no pet.). We defer to unchallenged fact findings that are supported by some evidence. *Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518, 523 (Tex. 2014).

When the burden of proof at trial is by clear and convincing evidence, we apply a higher standard of legal and factual sufficiency review. *Boyd*, 131 S.W.3d at 611. When reviewing the evidence for legal sufficiency on such issues, we look at all the evidence in the light most favorable to the judgment to determine if the trier of fact could reasonably have formed a firm belief or conviction that the challenged finding was true. *Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848, 866 (Tex. 2017). And when reviewing for factual sufficiency, we determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the challenged finding is true. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

## III. CHARACTERIZATION OF INTEREST IN JOANDERSON CAPITAL

The trial court made the following findings of fact related to the characterization of Jessey's interest in JoAnderson Capital and the percentage of his ownership:

> 8) The evidence presented to support Petitioners' and Intervenors' request to change the characterization of the JoAnderson property was self-serving and not credible.

7

9) The evidence presented did not show by clear and convincing evidence that JoAnderson Capital, LLC was a separate property entity, nor that the funding for JoAnderson was funded by separate property funds.

. . . .

12) At the new trial[] hearing the Court found that the Petitioner's evidence was not credible and . . . fail[ed] to prove by clear and convincing evidence that the JoAnderson's asset was funded by separate property or that it was owned with anyone other than Petitioner and a person named Huang.

Additionally, the trial court found, "[b]ased on Jessey Chi Hua Lee's declaration of Richard Huang Yung Chang as his business partner, . . . [that] the community interest in JoAnderson Capital, LLC [was] 50% of the overall value of the company."

The appellants challenge these findings. In his first and second issues, Jessey maintains the trial court's finding that he failed to meet his burden to establish the interest in JoAnderson Capital as his separate property is not supported by legally sufficient evidence, arguing that no evidence supports that finding and that the evidence conclusively established the contrary. In their first issue, JoAnderson Capital, Jim, and Jenny contend that the evidence is legally insufficient to support the trial court's finding that Jessey's interest in JoAnderson Capital was 50%, arguing that no evidence supports that finding and that the evidence conclusively proved Jessey held only a 40% interest in the company. They alternatively argue that the trial court's finding is not supported by factually sufficient evidence. Because all of these issues overlap, we consider them together.

8

## A. APPLICABLE LAW

Under Texas law, property possessed by either spouse during or on dissolution of the marriage is presumed to be community property, absent clear and convincing evidence to the contrary. Tex. Fam. Code Ann. § 3.003. Clear and convincing evidence means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *Id.* § 101.007. This intermediate standard of proof falls between the preponderance standard of proof that applies to most civil proceedings and the reasonable-doubt standard that applies to most criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979). Clear and convincing evidence must outweigh evidence that would satisfy the preponderance standard, but it need not be unequivocal or undisputed. *Addington*, 588 S.W.2d at 570.

The characterization of property as either community or separate is determined by the inception of title to the property. *Boyd*, 131 S.W.3d at 612. Inception of title occurs when a party first has a right of claim to the property by virtue of which title is finally vested. *Id.* Separate property includes "property acquired by the spouse during marriage by gift, devise, or descent." Tex. Fam. Code Ann. § 3.001(2).

In order to overcome the community presumption, the burden is on the spouse claiming certain property as separate to trace and clearly identify the property claimed to be separate. *Boyd*, 131 S.W.3d at 612. The burden of tracing is a difficult, but not

impossible, burden to sustain. *Id.* Tracing involves establishing the separate origin of the property through evidence showing the time and means by which the spouse originally obtained possession of the property. *Id.* Separate property will retain its character through a series of exchanges so long as the party asserting separate ownership can overcome the presumption of community property by tracing the assets on hand during the marriage back to property that, because of its time and manner of acquisition, is separate in character. *Id.* However, if the evidence shows that separate and community property have been so commingled as to defy resegregation and identification, the community presumption prevails. *Id.*

When tracing separate property, it is not enough to show that separate funds could have been the source of a subsequent deposit of funds. *Id.* Moreover, as a general rule, mere testimony that property was purchased with separate funds, without any tracing of the funds, is insufficient to rebut the community presumption. *Id.* Any doubt as to the character of property should be resolved in favor of the community estate. *Id.*

## B. EVIDENCE

We begin our sufficiency review with a summary of the evidence relevant to the characterization of, and ownership interests in, JoAnderson Capital.

### 1. Jessey's Testimony and Financial Transaction Documentation

At the new trial, Jessey testified both from the witness stand and through a sworn declaration the trial court admitted into evidence. The trial court also admitted

various exhibits related to Jessey's testimony. We discuss Jessey's live testimony, declaration, and relevant exhibits together.

Jessey testified that the funds he had used to make his capital contribution to JoAnderson Capital came from a bequest from his paternal grandparents, who had lived in Taiwan. Jessey said that his paternal grandfather had died sometime in 1980, that his paternal grandmother had died in 2002, and that although he had not been able to procure a will or other related probate documentation related to the death of his grandparents, he had obtained both a sworn declaration and the deposition on written questions of Mei Tao, who was the conservator of his grandparents' estate. According to Jessey, Tao administered his grandparents' estate through a Taiwanese company called Bonanza, Inc.

Jessey averred that he and Huang formed JoAnderson Capital to hold a single piece of California real estate (the beach house). The amount of his capital contribution to JoAnderson Capital was $883,996, which represented a 40% interest in the company, while Huang contributed $1,325,994, which represented the remaining 60% interest. Jessey testified the he had never owned a 50% interest in JoAnderson Capital, that he only owned a 40% interest, and that he had never owned more than a 40% interest.

Jessey explained that the funds for his and Huang's contributions were delivered to JoAnderson Capital through a series of transactions, which he detailed as follows.

11

**04/01/14**      A company called Everstar Capital LP wired $63,750 to Guaranty Escrow, Inc. Jessey testified that Everstar advanced these funds for a deposit on the beach house.

To his declaration, Jessey attached Exhibit 3, which was a receipt memorializing this wire transaction.

**04/10/14**      Jessey wrote a $10,000 personal check to JoAnderson Capital, which it deposited into its account at American First National Bank (AFNB). Jessey testified that this was an advance on his contribution to JoAnderson Capital.

Jessey attached to his declaration as Exhibit 4 a copy of the cancelled check reflecting this transaction.

**04/15/14**      Huang wired $285,000 into JoAnderson Capital's account at AFNB as an advance on a bequest from Jessey's grandparents for Jessey's contribution to JoAnderson Capital.

The trial court admitted Petitioner's Exhibit 3, which is a receipt reflecting this wire transfer.

**04/16/14**      Huang wired $700,000 to Guaranty Escrow as part of his contribution for JoAnderson Capital.

The trial court admitted Petitioner's Exhibit 7, which is a receipt reflecting this wire transfer.

**04/17/14**    Bonanza wired $600,000 to Huang's bank account. These funds were wired to Huang on Jessey's behalf, and the funds came from a bequest from Jessey's grandparents.

The total amount of the transfer should have been $610,000, but Bonanza only wired $600,000. The $610,000 was intended to reimburse Huang for the $285,000 he had wired into JoAnderson Capital's account on Jessey's behalf as an advance on the bequest from his grandparents as well as to distribute to Jessey an additional $325,000 of the bequest from his grandparents.

The trial court admitted Petitioner's Exhibit 4, which is a receipt reflecting this wire transfer.

**04/17/14**    Huang wired $325,000 into JoAnderson Capital's account at AFNB on Jessey's behalf.

The trial court admitted Petitioner's Exhibit 5, which is a receipt reflecting this wire transfer.

**04/18/14**    Bonanza wired $299,990 to JoAnderson Capital's account at AFNB. Jessey testified that $273,996 of this amount was on his behalf as another portion of the bequest from his grandparents. He further stated that $10,000 of the remaining $25,994 was to correct the $10,000 shortfall that had occurred in Bonanza's April 17, 2014 transfer to Huang. Jessey averred that the remaining $15,994 was wired on Huang's behalf as part of his contribution to JoAnderson Capital.

The trial court admitted Petitioner's Exhibit 6, which is a receipt reflecting this wire transfer.

**04/21/14**    JoAnderson Capital wired $804,341.59 to Guaranty Escrow out of its account at AFNB.

The trial court admitted Petitioner's Exhibit 8, which is a receipt reflecting this wire transfer.

13

| | |
|---|---|
| **04/22/14** | Huang wired $600,000 to Guaranty Escrow as an additional part of his contribution. |
| | The trial court admitted Petitioner's Exhibit 9, which is a receipt reflecting this wire transfer. |
| **05/06/14** | JoAnderson Capital wrote a check to Everstar in the amount of $63,750 to reimburse it for the funds it had advanced to Guaranty Escrow on April 1, 2014. |
| | The trial court admitted Petitioner's Exhibit 21, which is a copy of the cancelled check reflecting this transaction. |
| **11/02/15** | JoAnderson Capital wrote a check to Jessey in the amount of $10,000. This was to reimburse the amount Jessey advanced by personal check on April 10, 2014. |
| | The trial court admitted Petitioner's Exhibit 22, which is a copy of the cancelled check for this transaction. |

Jessey testified that the net effect of these transactions confirmed that his total capital contribution to JoAnderson Capital was $883,996 and that the source of those funds came from a bequest from his grandparents.

### 2. David Fuller

By agreement of the parties, David Fuller, CFA, ASA, testified by deposition at the new trial. He testified that he was president of a financial valuation consulting firm focused on the valuation of businesses and that his experience and training included providing expert opinions regarding the characterization and valuation of marital property. Fuller indicated that Jessey and Crystal had jointly hired him to provide several opinions concerning their marital property, which included providing

14

an opinion as to the characterization of the interest Jessey had obtained in JoAnderson Capital. Fuller testified that he had concluded that the entire interest Jessey had acquired in JoAnderson Capital was his separate property. In his report, which was attached as an exhibit to his deposition, Fuller opined that Jessey held a 40% ownership interest in JoAnderson Capital and that his parents collectively owned the remaining 60% ownership interest.

Fuller testified that he began his original analysis by interviewing Jessey and Crystal, and obtaining documents, about the marital property issues they had hired him to analyze, which included the characterization of the interest in JoAnderson Capital. He then compared the amount of capital contributions reflected in JoAnderson Capital's business records with documents tracing the source of those funds and calculated that JoAnderson Capital's records showed Jessey's total capital contribution was $4,000 more than the total funds that could be traced back to the bequest from his grandparents. This led Fuller to originally conclude that all but $4,000 of Jessey's contribution to JoAnderson Capital was his separate property. But Fuller further testified that after he drafted his original report and testified at the original trial, Jessey provided him with supplemental documentation that explained the apparent $4,000 discrepancy between JoAnderson Capital's records and the tracing documentation. Fuller stated that the supplemental documentation revealed there actually was not a discrepancy between JoAnderson Capital's records and the

15

tracing documentation, and thus he concluded the entire interest Jessey acquired in JoAnderson Capital was his separate property.

The documentation Fuller reviewed as the basis of his analysis included a portion of Jessey's 2014 federal tax return; sworn declarations from Huang, Tao, and Jessey, including relevant wire-transfer receipts and copies of cancelled checks that were attached as exhibits; and the deposition upon written questions of Huang and Tao. Fuller testified that these were the sort of documents he routinely reviewed in rendering opinions as an expert.

Fuller also testified that he was familiar with Crystal's allegations that the funds Jessey used to acquire the interest in JoAnderson Capital did not come from a bequest from his grandparents but rather came from

> money that had been accumulated overseas from the transactions that [Jessey] was involved in through LF Enterprises and that he was bringing back, in effect, earnings that related to LF Enterprises and calling it a bequest because that would allow him to argue that it was his separate and not their community property.

He further testified that Crystal had not provided any documentation to substantiate those allegations.

Fuller stated that there were no inconsistencies among the tracing documents he had reviewed and that the documents were "substantial in terms of addressing the sources of the funds." He stated that he had no reason to believe there was a problem with the accuracy or reliability of the documents and that the documents indicated that the interest Jessey acquired in JoAnderson Capital was his separate

16

property. He stated this conclusion was "firm in [his] mind" based on the evidence he had been provided and the lack of contrary evidence.

### 3. Richard Huang

Huang testified at trial through the same sworn declaration and deposition upon written questions Fuller had reviewed. Like Jessey, Huang testified that he and Jessey had formed JoAnderson Capital in 2014 to hold the California beach house and that he had contributed $1,325,994 for a 60% ownership interest in JoAnderson Capital, while Jessey had contributed $883,996 for a 40% interest. Huang also traced the funds that had been used for the capital contributions to JoAnderson Capital, and he provided wire-transfer receipts and cancelled checks to support his testimony. The substance of Huang's testimony and the exhibits he provided matched the testimony and exhibits Jessey had provided. Huang further stated that he sold his 60% interest to Jessey's parents on November 6, 2014.

### 4. Mei Ni Tao

Tao also testified at trial through the same sworn declaration and deposition upon written questions Fuller had reviewed. She testified that she lived in Taiwan and was the conservator of Jessey's paternal grandparents' estate. She further said that in Taiwan, a conservator is the person in charge of carrying out the terms of a deceased person's estate. Tao averred that she had a Taiwanese company called Bonanza, Inc. and that she used that company to manage the estate of Jessey's paternal grandparents. Tao additionally testified about two wire transfers Bonanza made on

17

April 17, 2014, and April 18, 2014, which both Jessey and Huang had testified to. The substance of Tao's testimony matched Jessey's and Huang's. And like Jessey and Huang, Tao provided wire-transfer receipts for the two wire transfers she testified about. Tao testified that the funds she had transferred on Jessey's behalf came from a bequest from his deceased grandparents.

### 5. Tax Form

The trial court also admitted the portion of Jessey's 2014 federal tax return that Fuller had reviewed. This was a Form 3520 entitled "Annual Return To Report Transactions With Foreign Trusts and Receipt of Certain Foreign Gifts." Jessey checked the box next to the statement that he was "a U.S. person who, during the current tax year, received certain gifts or bequests from a foreign person." Jessey further indicated that during the current tax year, he had received more than $100,000 that he "treated as gifts or bequests from a nonresident alien or a foreign estate." On the form, he noted that he had received a bequest from his grandparents on April 15, 2014, April 17, 2014, and April 18, 2014, in the amounts of $285,000, $325,000, and $273,996, respectively. The form indicated that it had been prepared by a CPA, and it was signed by Jessey underneath a declaration that stated: "Under penalties of perjury, I declare that I have examined this return, including any accompanying reports, schedules, or statements, and to the best of my knowledge and belief, it is true, correct, and complete."

18

### 6. Crystal's Testimony

Crystal briefly testified at the new trial. She testified that she was a member of LF Enterprises and had knowledge of its revenue for 2013, 2014, and 2015. She further stated that she believed the source of the funds Jessey used to contribute to JoAnderson Capital actually came from money LF Enterprises had made. She acknowledged that she did not have any documentation to support her belief. Instead, her entire testimony regarding her allegation that Jessey had acquired the interest in JoAnderson Capital with community funds was as follows:

> Furniture has the second highest markup, next to jewelry. And Jessey has proven that you can afford a really lavish lifestyle in this business, with the Rolls Royce and the Ferraris and our lifestyle. And so we had the money to be able to buy this beach house, and the way we did it was to avoid paying taxes in California. That's why we bought it through JoAnderson Capital.
>
> We are 183 days domiciled in the state of Texas, one party or the other. And so this is our beach house. The girls just were at the beach house. Jessey's still at the beach house. Both of his cars are still parked at the beach house. Not a dime was generated in income from JoAnderson Capital since the Judge awarded him possession of it. It is not a rental property. It's our home. It's a home that we -- we met in Los Angeles. We've lived in Los Angeles. We have rental agreements. Before we even bought the beach house, that was our -- that was our dream. That was our life.

### 7. Jessey's Declaration in California Litigation

The record shows that just prior to Jessey's filing his original petition for divorce, Crystal had filed a petition for divorce in California. Although the California court ultimately determined that jurisdiction was properly in Texas, Jessey did file

19

pleadings in the California proceeding. Jessey attached a declaration to one of those pleadings in which he averred as follows:

15. The purchase agreement for the purchase of the [California beach house] was not in Petitioner's name; it was purchased as an investment only by me and my business partner "Richard" Huang Yung Chang.

16. Title to the property was taken in the name of our business partnership, "JoAnderson Capital, LLC.["]

17. The last page of the purchase agreement confirms that $600,000 towards the purchase price came from my partner, Richard Huang Yung Chang. No money for the purchase of this property came from any account in the name of Petitioner and she has no interest in the property.

The trial court admitted this declaration at trial.

## 8. Intervenors' Exhibits

The trial court admitted Intervenors' Exhibit 2, which was a written consent of JoAnderson Capital's members dated to be effective on November 6, 2014. That document, signed by both Jessey and Huang, reflected that Huang had withdrawn as a member of JoAnderson Capital and that Jim and Jenny were accepted as new members of the company, each holding a 30% interest.

The trial court also admitted Intervenors' Exhibits 4-7, which were copies of JoAnderson Capital's California and federal tax returns for the 2014 and 2015 tax years. Intervenor's Exhibits 4 and 6 were copies of the California returns, which contained a California Schedule K-1, entitled "Member's Share of Income, Deductions, Credits, etc." That form contained a line for the company's members to

20

enter their percentage of profit sharing, loss sharing, and ownership of capital. For each of those categories, the forms show Jim's percentage to be 30%, Jenny's percentage to be 30%, and Jessey's percentage to be 40%.

Intervenor's Exhibits 5 and 7 were copies of the federal tax returns. Those returns contained Form 1065. The form contained a section for providing information about the members of the company. That section had a line entitled "Partner's share of profit, loss, and capital." For each of those categories, the forms show Jim's percentage to be 30%, Jenny's percentage to be 30%, and Jessey's percentage to be 40%.

### C. ANALYSIS

All appellants raise issues challenging the trial court's findings concerning both the characterization of the ownership interest Jessey acquired in JoAnderson Capital and the percentage of that ownership interest. We address each of those areas in turn.

### 1. Characterization of Ownership Interest

First, we consider the trial court's characterization findings. Jessey testified that he contributed $883,996 for the ownership interest in JoAnderson Capital, and he meticulously traced the source of those funds back to a bequest from his grandparents. But he did not rely on his testimony alone to establish the source of those funds. He supported his testimony with extensive documentation that included copies of wire-transfer receipts, cancelled checks, and federal tax forms prepared by a CPA, which Jessey signed under penalties of perjury. Jessey further supported his

21

own testimony with that of Huang and Tao, both of whom likewise supported their own testimony with wire-transfer receipts and cancelled checks. He also presented the testimony of the parties' agreed upon expert, who opined that it was firm in his mind that the $883,996 Jessey used to make the capital contribution in JoAnderson Capital was traceable back to a bequest from his grandparents. And to top it off, all of this evidence was uncontradicted. As we have noted, the burden of tracing is difficult, but it is not impossible. *Boyd*, 131 S.W.3d 612. We have no trouble concluding from this evidence that Jessey met his burden to show that the entire ownership interest he obtained in JoAnderson Capital was his separate property.

So on what basis, then, did the trial court find otherwise? The answer lies in the trial court's finding that all of the evidence Jessey had presented concerning the tracing of the funds he had used to acquire that interest was not credible, and based upon this credibility determination, the trial court disregarded all of that evidence. Crystal relies on the trial court's credibility determination in her pro se appellee's brief as the sole basis for upholding the trial court's finding that Jessey failed to establish the interest in JoAnderson Capital was his separate property. Jessey, however, contends that the trial court's credibility finding has no support in the record.

The factfinder is the sole judge of the credibility of the witnesses and the weight to give their testimony. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005) (legal sufficiency); *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (factual sufficiency). Thus, appellate courts generally afford great deference to a

22

factfinder's credibility determinations. *See In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *City of Keller*, 168 S.W.3d at 819. But an appellate court need not defer to credibility determinations that are unreasonable. *See In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005); *Gonzales v. Maggio*, 500 S.W.3d 656, 662 (Tex. App.—Austin 2016, no pet.). Here, all of the evidence Jessey presented at the new trial concerning the tracing of the funds he used to contribute to JoAnderson Capital was "undisputed . . .[,] clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted." *See City of Keller*, 168 S.W.3d at 820. Thus, the trial court was not free to disregard it. *See id.*; *One Ford Mustang v. State*, 231 S.W.3d 445, 454 (Tex. App.—Waco 2007, no pet.) (holding the trial court in civil forfeiture was not free to disbelieve "undisputed . . . clear, positive, [and] direct" testimony regarding whether the owner of a vehicle knew or reasonably should have known the operator of the vehicle was involved in narcotics trafficking (citation omitted)).

In sum, viewing all the evidence in the light most favorable to the trial court's findings, we conclude that no evidence supports the trial court's finding that Jessey failed to meet his burden to establish the interest he obtained in JoAnderson Capital was his separate property. *See Horizon Health*, 520 S.W.3d at 866. We further conclude that no reasonable factfinder could find that Jessey failed to prove the interest was his separate property; thus, the evidence conclusively shows the interest to be Jessey's separate property. *See City of Keller*, 168 S.W.3d at 816 ("Evidence is conclusive only if reasonable people could not differ in their conclusions.").

23

## 2. Percentage of Ownership Interest

We turn now to the trial court's finding that Jessey's ownership interest in JoAnderson Capital was 50%. The trial court expressly based that finding on Jessey's declaration in the California proceeding that Huang was his business partner. JoAnderson Capital, Jim, and Jenny contend that Jessey's reference to Huang as his business partner is no evidence that they each owned a 50% interest in JoAnderson Capital.

By relying on Jessey's reference to Huang as his business partner as its sole basis for finding that Jessey held a 50% interest in JoAnderson Capital, the trial court necessarily assumed Jessey's use of the term "business partner" meant partner in the traditional, formal legal sense. *See Johnston v. Ballard*, 18 S.W. 686, 686 (Tex. 1892) (noting the rule at common law that in the absence of evidence to the contrary, partners in a partnership share equally in the partnership's profits, losses, and capital stock). There are at least two problems with that assumption. First, it is undisputed that JoAnderson Capital is a California limited liability company, not a partnership. *See* Cal. Corp. Code § 16202(b) (providing that "[a]n association formed under a statute other than [the California Uniform Partnership Act of 1994], a predecessor statute, or a comparable statute of another jurisdiction is not a partnership"). Second, one's statement that another is his business partner in a limited liability company says nothing about their respective ownership interests, if any, in that company. Thus, in this context, Jessey's use of the term "business partner" to describe his relationship

24

with Huang, standing by itself, does nothing more than create a mere surmise or suspicion that he and Huang each owned 50% of the ownership interest in JoAnderson Capital. *See Ingram v. Deere*, 288 S.W.3d 886, 900 (Tex. 2009) (holding "'partner' is regularly used in common vernacular and may be used in a variety of ways" but using the term in "a colloquial sense is not legally sufficient evidence of expression of intent to form a business partnership"). We therefore conclude that no evidence supports the trial court's finding that Jessey owned 50% of JoAnderson Capital. *See Super Starr Int'l, LLC v. Fresh Tex. Produce, LLC*, 531 S.W.3d 829, 839–40 (Tex. App.—Corpus Christi–Edinburgh 2017, no pet.) (concluding no evidence supported trial court's partnership finding); *see also Bell Helicopter Textron, Inc. v. Burnett*, 552 S.W.3d 901, 913 (Tex. App.—Fort Worth 2018, pet. filed) ("[W]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence.").

JoAnderson Capital, Jim, and Jenny also contend that the evidence conclusively proved Jessey held only a 40% interest in JoAnderson Capital. As we set out above, Jessey testified at trial that his capital contribution to JoAnderson Capital was for a 40% interest in the company. Huang testified to the same. Further, in his report, the parties' agreed expert opined that Jessey owned a 40% interest in JoAnderson Capital. The trial court also admitted copies of JoAnderson Capital's state and federal tax returns for 2014 and 2015, which also showed that Jessey's share of JoAnderson

25

Capital was 40%. And all of this evidence was uncontradicted. No reasonable factfinder could disregard this uncontradicted, clear, positive, consistent evidence and find that Jessey's interest in JoAnderson Capital was anything other than 40%. Accordingly, JoAnderson Capital, Jim, and Jenny conclusively established Jessey's interest in JoAnderson Capital is 40%. *See City of Keller*, 168 S.W.3d at 816.

## IV. $24,341 IN RENTAL PROCEEDS

We turn to JoAnderson Capital, Jim, and Jenny's second issue. In the divorce decree, the trial court awarded Crystal "[t]he twenty-four thousand, three hundred forty-one and 00/100 dollars ($24,341) received from the rental of the [California beach house] owned by JoAnderson Capital, LLC." In their second issue, JoAnderson Capital, Jim, and Jessey contend that by awarding those rental proceeds to Crystal, the trial court erred as a matter of law.

In awarding the rental proceeds to Crystal, the trial court found those proceeds were community property. But it is undisputed that those rental proceeds came from persons who had rented the California beach house and had paid the rental fees directly to Crystal. And as recognized in the trial court's October 5, 2017 decree, it is also undisputed that JoAnderson Capital owned the California beach house from which the rental proceeds derived. As a general rule, the owner of real property at the time rent becomes due is entitled to the rent. *See Hearne v. Lewis*, 14 S.W. 572, 572 (Tex. [Comm'n Op.] 1890); *cf. S. Plains Switching, Ltd. v. BNSF Ry. Co.*, 255 S.W.3d 690, 707 (Tex. App.—Amarillo 2008, pet. denied) (holding that because an easement does

26

not convey title to real property, an easement holder is not entitled to share in rental proceeds stemming from the real property). Thus, the record conclusively establishes that the rental proceeds belonged to JoAnderson Capital and, consequently, that the trial court mischaracterized those funds as Jessey and Crystal's community property.

## V. HARM

We briefly address harm. A trial court's mischaracterization of property does not always constitute reversible error. *See Tate v. Tate*, 55 S.W.3d 1, 6–7 (Tex. App.—El Paso 2000, no pet.). In most circumstances, a party that establishes the trial court mischaracterized property must, in order to prevail on appeal, additionally show that because of the mischaracterization, the overall division of property constitutes an abuse of discretion. *See id.* Here, however, the trial court's mischaracterization resulted in Jessey being divested of his separate property, in Jim and Jenny being divested of a portion of their ownership in JoAnderson Capital, and in JoAnderson Capital being divested of its rental proceeds. These errors are reversible as a matter of law. *See Gibson v. Gibson*, 190 S.W.3d 821, 823 (Tex. App.—Fort Worth 2006, no pet.) ("Divesting a partnership that is not a party to a divorce proceeding of partnership property and awarding that property to a nonpartner spouse is reversible error."); *Siefkas v. Siefkas*, 902 S.W.2d 72, 79–80 (Tex. App.—El Paso 1995, no writ) (holding the trial court reversibly erred by dividing property that may have been owned by the appellant's professional corporation, which was a separate legal entity and not a party to the proceedings); *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 142 (Tex. 1977) (holding

27

that divesting a spouse of separate property is reversible error). Accordingly, we sustain Jessey's first and second issues, and we sustain JoAnderson Capital, Jim, and Jenny's first and second issues. Because those issues are dispositive, we do not reach Jessey's remaining issues.[1] *See* Tex. R. App. P. 47.1.

## VI. CONCLUSION

Having sustained Jessey's first and second issues, and having sustained JoAnderson Capital, Jim, and Jenney's first and second issues, we reverse the trial court's judgment as to the property division and remand the case to the trial court for a redivision of Jessey and Crystal's community estate that excludes the erroneously

---

[1]In Jessey's third issue, he argues the evidence is factually insufficient to support trial court's characterization of his interest in JoAnderson Capital as community property. Because we have sustained his first and second issues and those issues are dispositive of Jessey's characterization complaint, we need not address his third issue. *See* Tex. R. App. P. 47.1.

In his fourth issue, Jessey argues the trial court abused its discretion by awarding Crystal a $600,789 money judgment. The trial court awarded this judgment "[f]or the purpose of a just and right division of property made in [its] decree," and it further ordered that the money judgment was "part of the division of community property between the parties and shall not constitute or be interpreted to be any form of spousal support, alimony, or child support." In his fifth issue, Jessey argues various other aspects of the trial court's division of property resulted in a manifestly unjust division.

Because we have already found reversible error in the division—overvaluing the community estate by more than $1.125 million—we need not address these issues and decline to do so. *See Moore v. Moore*, No. 01-13-00182-CV, 2014 WL 2538555, at *7 (Tex. App.—Houston [1st Dist.] June 5, 2014, no pet.) (mem. op.). The trial court may consider those issues on remand. *See Siefkas*, 902 S.W.2d at 80 (recognizing "erroneous division of non-community property may affect whether the trial court deems the remaining awards [to be] just and right").

characterized property. *Gibson*, 190 S.W.3d at 822. We affirm the portion of the judgment granting the parties a divorce. *See id.*

/s/ Lee Gabriel

Lee Gabriel
Justice

Delivered: July 11, 2019